**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION**

| | |
|---|---|
| JOSHUA WAGNER, individually and on behalf of the HESS CORPORATION EMPLOYEES' SAVINGS PLAN, and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>HESS CORPORATION and HESS CORPORATION INVESTMENT COMMITTEE,<br><br>*Defendants*. | C.A. No. 6:24-cv-00004<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

### INTRODUCTION

Plaintiff Joshua Wagner ("Plaintiff"), on behalf of the Hess Corporation Employees' Savings Plan (the "Plan"), himself, and all others similarly situated, brings this class action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against the fiduciaries of the Plan, for breaches of their fiduciary and other duties. The liable fiduciaries include Hess Corporation ("Hess") and Hess Corporation Investment Committee (the "Investment Committee") (collectively, "Defendants"). Plaintiff brings this action by and through his attorneys based upon personal knowledge, account information provided to him as a participant in the Plan, information contained in the Plan's publicly available Form 5500 filings with the United States Department of Labor, and other information obtained through investigation. Plaintiff anticipates that discovery will uncover further support for the allegations in this Complaint, and, potentially, for additional claims.

As described herein, Defendants have breached their fiduciary duties to Plaintiff, in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiff

1

brings this action to remedy this unlawful conduct, prevent further mismanagement going forward, and obtain equitable and other relief as provided by ERISA. Plaintiff requests this relief for the benefit of the Plan and its participants and beneficiaries.

In support of his claims, Plaintiff states and alleges as follows:

### NATURE OF THE CASE

1. Plaintiff brings this case on behalf of the Plan, himself, and all persons who were and/or are participants in or beneficiaries of either or both the Plan and fall within the definition of the Class set forth herein, pursuant to the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*

2. Plaintiff brings this case against Defendants, as fiduciaries of the Plan, for breaches of their fiduciary duties during the Class Period (defined as the six-year period preceding the filing of the original Complaint in this case through the date of judgment).

3. To protect plan participants and beneficiaries, ERISA imposes strict fiduciary duties on employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(A)–(B). These fiduciary obligations of plan fiduciaries to the participants and beneficiaries of an ERISA-governed plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

4. Employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *A Look at 401(k) Plan*

2

*Fees* (Sept. 2019) [hereinafter *A Look at 401(k) Plan Fees*] at 2, 401(K) Plan Fees: A Guide to Maximizing Retirement Savings (dol.gov) (last visited February 12, 2024).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of services to the plan and investment options. *See also* the Texas Uniform Prudent Investor Act (UPIA), Tex. Prop. Code Ann. § 117.001 et seq. (the "prudent investor rule"),

6.      "Cost-conscious management is fundamental to prudence in the investment function and should be applied not only in making investments but also in monitoring and reviewing investments." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (internal quotations and citations omitted).

7.      Additional fees measuring in basis points – mere tenths or hundredths of a percent (e.g., 0.18% or 0.4%) – can have a large impact on a participant's investment results over time because plan participants and beneficiaries "subject to higher fees . . . lose not only the money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Id.* (internal quotations and citations omitted).

8.      "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes v. Northwestern University*, 595 U.S. 170, 176 (2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015)). And, if the fiduciaries "fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id*.

9.      According to Morningstar's 2023 Retirement Plan Landscape Report, the Plan is a "Mega plan" because it has over $900 million in plan assets.

10.    Compared to other 401(k) plans, the Brightscope/ICI Defined Contribution Plan Profile report dated September 2023 (utilizing 2020 data) places the Plan within the top 0.3% of 401(k) plans based on plan assets (out of 616,050 total 401(k) plans).

11.    As of December 31, 2022, the Plan held $902,572,962 in total assets.

12.    As one of the largest 401k plans in the United States, the Plan had (and continues to have) substantial bargaining power regarding the fees, expenses, and costs charged against participants' investments.

13.    During the Class Period, Defendants, as fiduciaries of the Plan, breached the duties they owed to the Plan, to Plaintiff, and to other participants and beneficiaries of the Plan by failing to adequately monitor and control fees, expenses, and costs, allowing service providers to charge excessive fees, expenses, and costs.

14.    Defendants' mismanagement of the Plan cost the Plan and its participants millions of dollars.

15.    Plaintiff brings this action to remedy the losses sustained as a result of Defendants' fiduciary breaches and to obtain such further equitable or remedial relief as may be appropriate to redress and to enforce the provisions of ERISA.

16.    Plaintiff asserts claims against Defendants for breaching their fiduciary duties, as set forth below.

17.    This Complaint is based upon known facts and reasonable inferences drawn from the facts as set forth herein.

**THE PARTIES**

**Plaintiff**

18.    Plaintiff resides in San Angelo, Texas.

19.     Plaintiff was employed by Hess from August 2018 to November 2021 and participated in the Plan.

20.     After ending his employment with Hess on or about November 15, 2021, Plaintiff remained a participant in the Plan into 2022, taking his last distribution out of the Plan on or around June 27, 2022.

21.     Plaintiff has standing to bring this action because he previously participated in the Plan, he is a former participant in the Plan, and he was personally injured in fact as a result of Defendants' breaches of their fiduciary duties as alleged in more detail below[1]. Those injuries include but are not limited to monetary injury from the imprudent investment options offered to Plaintiff by the Plan, the overarching process by which Defendants chose imprudent options for the Plan, the denial of the opportunity to invest in lower-cost alternative funds, and diminution of the value of Plaintiff's retirement assets.

**Defendants as Fiduciaries under ERISA**

22.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

23.     ERISA treats as fiduciaries not only persons expressly named as fiduciaries under 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.

24.     Defendants are, or during the Class Period were, fiduciaries of the Plan under ERISA.

25.     Defendants are or were fiduciaries of the Plan because they were so named; they

---

[1] Plaintiff's statements issued by the Plan show that he personally invested in a number of investments that are the basis for this Complaint, including a T. Rowe Price Target Date fund, the Vanguard Institutional Index Fund, and the Schwab Select Large Cap Growth. Therefore, Plaintiff's personal retirement funds were diminished by Defendants' breach of their fiduciary duties.

exercised authority or control respecting management or disposition of the Plan's assets; they exercised discretionary authority or discretionary control respecting management of the Plan; and/or they had discretionary authority or responsibility in the administration of the Plan.

**The Corporate Defendant**

26.     Hess is a "leading global independent energy company" "engaged in exploration, development, production, transportation, purchase and sale of crude oil, natural gas liquids, and natural gas," with "production operations located in the United States (U.S.), Guyana, the Malaysia/Thailand Joint Development Area (JDA) and Malaysia" and "exploration activities in offshore Guyana, in the U.S. Gulf of Mexico, and offshore Suriname and Canada."[2]

27.     On October 23, 2023, Chevron Corporation announced an agreement with Hess to acquire all of the outstanding shares of Hess in an all-stock transaction valued at $53 billion, expected to close in the first half of 2024.[3]

28.     Hess is currently and has been the sponsor of the Plan since at least 2017.

**The Investment Committee Defendant**

29.     Hess delegated to the Investment Committee the responsibility for the selection and monitoring of the Plan's investments, including selecting and retaining prudent investment options for plan participants, as well as the Plan's contractual relationship with Fidelity as trustee and recordkeeper.[4]

30.     Under the Plan, the members of the Investment Committee are appointed and serve

---

[2] Hess Corporation 2022 Annual Report, 6e6ea664-8223-4af4-8211-f0a027e70a9d (hess.com) (last visited February 12, 2024).
[3] Chevron, *Chevron announces agreement to acquire Hess*, Chevron Announces Agreement to Acquire Hess — Chevron (last visited February 12, 2024).
[4] The Hess Corporation Employee Benefit Plans Committee is responsible for operational aspects of the Plan (such as completing and filing Form 5500s). Plaintiff specifically reserves the right to name that committee as a defendant.

at the pleasure of the Chief Executive Officer of Hess.[5]

**Defendants' Citizenship and Service Information**

31.     Hess is a publicly traded, Delaware corporation, headquartered in New York, New York, and has been served through its registered agent, CT Corp System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

32.     By stipulated agreement of counsel, both Hess and the Investment Committee may be served with this First Amended Class Action Complaint through outside legal counsel for Hess, Mr. William Delany, at Groom Law Group, Chartered, 1701 Pennsylvania Ave., NW, Suite 1200, Washington, DC 20006.

## THE PLAN

33.     The Plan is a defined contribution plan as defined by ERISA.

34.     Since at least 2017, Hess has been the sponsor of the Plan.

35.     Since at least 2017, the Investment Committee has had delegated to it the responsibility of selecting and monitoring the Plan's investments and the Plan's contractual relationship with Fidelity as the Plan's recordkeeper.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

37.     This Court has personal jurisdiction over Defendants because they transact business

---

[5] Plaintiff specifically reserves the right to name at any time any or all of the individual members of these committees or other individuals who may bear responsibility or liability, including the Chief Executive Officer of Hess.

7

in and have significant contacts with this District and because ERISA provides for nationwide service of process.

38.    Venue is proper in the Northern District of Texas, San Angelo Division, pursuant to 29 U.S.C. § 1132(e)(2), because some or all of the breaches and violations of ERISA alleged herein occurred in this District and Defendants may be found in this District.

39.    Venue is also proper in the Northern District of Texas, San Angelo Division, pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### ERISA'S FIDUCIARY STANDARDS

40.    To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty, prudence, diversification, and compliance with the plan document upon plan fiduciaries. 29 U.S.C. § 1104(a)(1).

41.    These fiduciary duties apply to Defendants because they are or were fiduciaries of the Plan during the Class Period.

42.    ERISA § 404(a)(1) imposes a "prudent person" standard of care on plan fiduciaries:

[A] fiduciary shall discharge [her or his] duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A)    for the exclusive purpose of:

(i)    providing benefits to participants and their beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan;

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

8

(D)   in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a)(1).

43.   ERISA also imposes co-fiduciary duties on plan fiduciaries under ERISA § 405, which states in relevant part that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)   if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105.

44.   Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments must act prudently and solely in the interest of participants and beneficiaries of the plan.

45.   Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996), *cert. denied*, 519 U.S. 810 (1996).

46.   Indeed, fiduciary decisions may dramatically affect the amount of money participants save for retirement.

47.   For example, an illustration from the Department of Labor shows that a 1% difference in fees over a person's career makes a 28% difference in retirement savings. *A Look at*

9

*401(k) Plan Fees* at 2.

48.    An ERISA fiduciary has a continuing duty to monitor investments and remove imprudent ones. *Tibble*, 575 U.S. at 530.

49.    Prudence requires a review at "regular intervals." *Id.* at 529 (citations omitted).

50.    As the Department of Labor has explained:

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

51.    As the Supreme Court recently explained in *Hughes*, plan fiduciaries may not simply provide a menu of options, some of which are prudent, and rely "on the participants' ultimate choice" from that menu to excuse their imprudent decisions. 595 U.S. at 176 (citing *Tibble*, 575 U.S. at 530). "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* (citing *Tibble*, 575 U.S. at 529-30).

52.    In *Hughes*, the Supreme Court applied *Tibble* to the pleading standard for a wide range of alleged plan deficiencies, including allegations that fiduciaries "failed to monitor the Plans' investments in a number of ways, including … neglecting to provide cheaper and otherwise-identical alternative investments." *Hughes*, 595 U.S. at 175-176.

53.    The Supreme Court held that a failure to remove an imprudent investment option from a plan within a reasonable time is a fiduciary breach. *Id*. at 176.

54.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries, as the Department of Labor has explained:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

55.     In a separate publication, the Department of Labor further explained:

> The Federal law governing private-sector plan, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing a plan – referred to as fiduciaries – carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.
>
> . . . .
>
> Plan fees and expenses are important considerations for all types of plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.
>
> . . . .
>
> **Investment fees.** By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are

11

deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses* (Sept. 2021) at 1-2, Understanding Retirement Plan Fees and Expenses (dol.gov) (last visited February 12, 2024).

**GENERAL ALLEGATIONS**

**Background of the Plan**

56.    The Plan is a defined contribution plan within the meaning of ERISA.

57.    A "defined contribution" or "individual account" plan is a type of retirement plan in which an individual account is set up for each participant, and benefits are based on the amounts contributed to those accounts (through employee contributions and, if applicable, employer contributions), and any income, expenses, gains, and losses.

58.    Each participant directs plan contributions in his or her individual account into one or more investment alternatives in a lineup chosen by the plan's fiduciaries.

59.    Participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of the contributions, less expenses.

60.    Defendants selected and retained various investment options made available to participants in the Plan and chose the recordkeepers for the Plan.

61.    At the choice and discretion of Defendants, various investment options were made available to participants in the Plan.

62.    The fiduciaries have exclusive control over this menu of investment alternatives available to plan participants.

63.    As the Plan's fiduciaries, Defendants must engage in a prudent and loyal process to select, monitor, remove, and retain the Plan's investment options.

64.    ERISA's duty of prudence is a continuing one; that is, a fiduciary has a continuing duty (as opposed to a one-time duty) to monitor plan investments and remove imprudent ones.

65.    As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must provide diversified investment options for the Plan. But diversification is not the only consideration for a prudent and loyal fiduciary. ERISA also requires Defendants to evaluate and monitor the fees and costs associated with the Plan's investment options and to give substantial consideration to those fees and costs when determining which options to remove or retain.

66.    Each investment option has its own fees, typically expressed as a percentage of assets under management, or expense ratio. If, for example, a fund charges 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points. The fees deducted from an investment option reduce the value of the shares, and thus reduce the returns participants receive on their investments. These plan expenses can significantly reduce the value of an account in a defined-contribution plan.

67.    Thus, "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble*, 843 F.3d at 1198.

68.    A fiduciary's failure to switch (or timely switch) to less expensive, substantially identical funds raises "plausible" "inferences of mismanagement" that the fiduciary either "failed to negotiate aggressively enough" or was simply "asleep at the wheel":

> The complaint alleges that the marketplace for retirement plans is competitive, and with $3.8 billion invested, WashU's "pool of assets" is large. From these facts, two inferences of mismanagement are plausible from WashU's failure to offer more institutional shares. The first is that it failed to gain access to them because, as the

complaint alleges, it did not negotiate aggressively enough with Vanguard. The second is that it was asleep at the wheel: it failed to pay close enough attention to available lower-cost alternatives. Either way, a "failure of effort [or] competence" is enough to state a claim for breach of the duty of prudence.

*Davis v. Washington University in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020).

69.    The fees assessed to 401(k) plan participants are generally attributable to two types of services: plan recordkeeping and investment management.

70.    The Plan's fiduciaries have control over these expenses.

71.    The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation.

72.    As a result of the foregoing, these fiduciary decisions have the potential to dramatically affect the amount of money plan participants are able to save for retirement, and fiduciaries must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees.

73.    A fiduciary's "duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule." Restatement (Third) of Trusts ch. 17 intro. note, Westlaw (May 2022); *see also Tibble*, 575 U.S. at 529-30 (relying on Restatement (Third) of Trusts to interpret ERISA).

74.    This duty to engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees is particularly true for the Plan in this case because it is a very large plan with the bargaining power and leverage to negotiate for, and obtain, the lowest fees.

75.    Plan fiduciaries must be continually mindful of the types of investment options available to large 401(k) plans to ensure they do not unduly risk plan participants' savings or charge unreasonable fees.

76.    As the Department of Labor has explained: "Plans with more total assets may be

able to lower fees by using special funds or classes of stock in funds, which generally are sold to larger group investors. 'Retail' or 'brand name' funds, which are also marketed to individual and small group investors, . . . typically charge higher fees." *A Look at 401(k) Plan Fees* at 8.

77.     Based on the most recent data available to Plaintiff, the Plan was in the top 0.3% of all 401(k) plans in terms of plan assets, making it one of the largest 401(k) plans in the United States.

78.     Because of the size of the Plan, its fiduciaries had access to investments options not generally available to smaller plans and significant bargaining power with respect to the fees and expenses that were charged against participants' investments.

79.     But, as described below, despite the size of the Plan, Defendants breached their fiduciary duties by failing to take (or timely take) advantage of this leverage and bargaining power, and failing to take (or timely take) appropriate actions to reduce the Plan's investment expenses, or failing to exercise appropriate judgment to scrutinize each investment option that was offered in the Plan during the Class Period to ensure it was prudent.

80.     Like plaintiffs in similar cases, Plaintiff did not have, and does not have, actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, such as Defendants' processes, and execution of such processes, for selecting, monitoring, reviewing, and removing investment options, or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden*, 588 F.3d at 598 ("If plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

81.     Plaintiff did not have knowledge of all material facts necessary to understand that

Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed, including, among other things, the investment options that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of the Plan's investments versus available alternatives within similarly sized plans, total cost comparisons to similarly sized plans, information regarding other available (and less expensive) share classes, and information regarding the availability and pricing of collective trusts and separate accounts. Having never managed large 401(k) plans such as the Plan, Plaintiff lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans. Plaintiff did not and could not review the meeting minutes or other evidence of Defendants' fiduciary decision-making process, or the lack thereof.

**The fiduciaries of the Plan failed to administer the Plan in a prudent manner**

82.     Based upon the most recent data available to Plaintiff, the Plan had over $900 million and was in the top 0.3% of all 401(k) plans based on plan assets throughout the Class Period. For example, as of December 31, 2022, the Plan had 3,058 participants, with $902,572,962 in total assets, approximately $630 million of which were invested in mutual funds.[6]

83.     As described above, Hess and the Investment Committee were fiduciaries of the Plan.

84.     Based on alleged facts and the reasonable inferences regarding these facts, Defendants failed to administer the Plan in a prudent manner, in violation of their fiduciary duties.

85.     For example, Defendants did not adhere to standard fiduciary best practices to control the Plan's costs when looking at certain aspects of the Plan's administration, such as monitoring investment management fees for the Plan's investments, resulting in many of the

---

[6] Hess Form 5500, Schedule H, Line 4I (filed with the U.S. Dept. Labor, June 6, 2023).

investment options during the Class Period being more expensive than comparable investment options found in similarly sized plans.

86.    Retirement plan participants pay for the cost of the plan's investment options via each option's expense ratio, based on a percentage of assets. For example, an expense ratio of 0.77% means the participant will pay $7.70 annually for every $1,000.00 in assets. This expense ratio thus reduces the participant's return and the compounding effect of that return. Thus, prudent plan fiduciaries must consider the effect that expense ratios have on investment returns, as it is in the best interest of participants to do so.

87.    Here, Defendants could not have engaged in a prudent process as it relates to the investment management fees charged to participants in the Plan.

88.    When running their business, Defendants' capital investment program "reflects continued execution of our strategy to invest only in high return, low cost opportunities within our portfolio."  *See* [Hess Announces 2023 E&P Capital and Exploratory Budget | Hess Corporation](#) (last visited February 12, 2024).  Defendants clearly understand the impact of cost on investment return.

89.    But, as explained below, Defendants failed to take advantage of lower cost investment vehicles that were otherwise substantially identical to those in the Plan, such as collective trusts (also called "collective investment trusts" and "collective trust funds"), and failed to offer the Plan's participants alternative investment options that were less costly and equally or better-performing.

90.    As a result of Defendants' systemic failure to properly investigate and select lower cost investment options for the Plan's participants (as explained in detail below), a substantial portion of the menu of investment options was overpriced compared to the other options that

prudent and loyal fiduciaries would have selected for the benefit of the Plan and its participants (*e.g.*, lower price collective trust versions that are otherwise substantially identical to mutual funds in the Plan and lower price, substantially similar alternative investments).

91.    During years 2018, 2019, 2020, 2021, and 2022 of the Class Period, an average of 40% of the investment options (excluding the company stock fund) offered by the Plan were overpriced.

92.    Had Defendants fulfilled their duties under ERISA and engaged in a prudent process to select, monitor, retain, and remove investment options from the Plan, these failures would not have occurred.

93.    Defendants' actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars in excessive fees.

**The fiduciaries of the Plan failed to replace the T. Rowe Price**
**target date mutual funds with substantially identical, but much**
**<u>less expensive, collective trust versions of these same funds</u>**

94.    Target-date funds ("TDFs") are a class of funds that periodically rebalance asset class weights to optimize risk and returns for a predetermined time frame. The asset allocation of a TDF is typically designed to gradually shift to a more conservative profile over time so as to minimize risk when the target date approaches. TDFs offer investors the convenience of putting their investing activities on autopilot in one vehicle. TDFs usually mature in five-year intervals, such as 2035, 2040, and 2045.

95.    From before January 1, 2017, through at least December 31, 2022, the Plan offered a series of T. Rowe Price TDFs among its offerings to Plan participants.

96.    During this period, the Plan had enough assets to qualify for the much-cheaper collective trust version of these same TDFs.

97.    Like mutual funds, collective trusts pool plan participants' investments but can provide an even lower fee alternative than mutual funds.

98.    Collective trusts are administered by banks or trust companies—which assemble a mix of assets such as stocks, bonds, and cash—and are not available to the general public. Collective trusts contract directly with 401(k) plans and provide regular reports regarding costs and investment holdings. Collective trusts use a unitized structure, and the units are valued daily. Participants invested in collective trusts can track their investments' daily performance online.

99.    Collective trusts are subject to regulation and oversight by the government, similar to mutual funds. Regulated by the Office of the Comptroller of the Currency, rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements and cannot advertise or issue formal prospectuses.

100.    Unlike with mutual funds, many collective trust managers are fiduciaries and are subject to ERISA fiduciary standards. In other words, they must manage the collective trusts solely in the plan participants' interest, which is a benefit to plan participants.

101.    Collective trusts are also subject to state and federal banking regulations that provide comparable protections to the Investment Company Act.

102.    To state it another way, collective trusts are subject to robust regulations, but do not have to be registered with the Securities and Exchange Commission because, unlike mutual funds, they are not a retail product available to the general public.

103.    Collective trusts thus can have much lower costs than mutual funds, with less or no administrative costs and less or no marketing or advertising costs.

104.    Retirement plans have used alternatives to mutual funds, such as collective trusts, for decades, and fiduciaries of other large plans were prudently paying attention and using their

scale to reduce costs by offering lower-cost collective trust versions of funds.

105.    As reported in March 2017, "CITs have become the fastest growing investment vehicle within 401(k) plans over the past seven years…. In the 401(k) market in particular, CITs have been gaining even more steam:  They have been growing at a CAGR of 18.3 percent, greatly outpacing both mutual funds and the expansion of 401(k) plans overall."  *See* Erach Desai and Jason Dauwen, *Collective Investment Trusts – A Perfect Storm, A DST White Paper* (March 2017) at 3, [Collective Investment Trusts - A Perfect Storm (mkt2225.com)](mkt2225.com) (last visited February 12, 2024).

106.    As Morningstar noted in May 2018, target-date providers "commonly make their strategies available in a different vehicle, via a collective investment trust, or CIT.  Collective investment trusts, which are designed for qualified institutional investors, typically cost less than mutual funds."  *See* Morningstar 2018 Target-Date Fund Landscape, May 7, 2018, p. 13.

107.    Prudent fiduciaries that utilized T. Rowe Price target date strategies started taking action to reduce their fees: "T. Rowe Price:  With roughly $13.5 billion in estimated net outflows in 2018 from its target-date mutual funds, T. Rowe Price saw the largest estimated net outflows for the second year in a row.  However, the firm's sizable asset growth in its CIT offering offset the fund outflows."  *See* Morningstar 2019 Target-Date Fund Landscape, May 9, 2019, p. 10.

108.    Even though the Plan had enough assets in its T. Rowe Price TDFs to qualify for the lower-cost collective trust counterpart of such funds and could have offered the collective trust version, the Plan did not do so.

109.    The T. Rowe Price TDFs used by the Plan were as much as 24% more expensive than the substantially identical collective trust fund version.

110.    The collective-trust-based T. Rowe Price Retirement Trust target-date series is a

20

substantially identical investment—other than its lower cost—to the mutual-fund-based T. Rowe Price Retirement Fund target-date series.

111.   In June 2019, Joseph F. Martel, a multi-asset portfolio specialist for T. Rowe Price, described T. Rowe Price's collective trust target-date series as having "the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay and underlying investments" as T. Rowe Price's mutual fund-based retirement funds target-date series. Robert Steyer, *CIT target-date assets surging as mutual funds hit by outflows*, Pensions & Investments (June 24, 2019).

112.   As indicated publicly by a representative of T. Rowe Price, other than the lower cost, the collective investment version is a substantially identical investment to the mutual fund version in all material respects and has the same manager.

113.   The less-costly collective trusts are managed by the same people, have the same investment strategies, objectives, and profiles, and are invested in a substantially identical portfolio of securities. They are substantially identical and alike in all ways, except cost.

114.   In simple terms, Defendants failed to switch to an investment option that was the same investment in a different wrapper at a much lower price, a manifestation of Defendants' failure to prudently monitor the Plan's investment options.

115.   There is no good-faith explanation for utilizing higher-cost funds when lower-cost funds are available for the exact same investment.

116.   From January 1, 2017, through at least December 31, 2022, approximately 60% of the Plan's T. Rowe Price TDFs were significantly more expensive than their substantially identical collective trust counterparts.

117. The following chart provides an example of how much more expensive the Plan's T. Rowe Price TDFs were than their substantially identical collective trust counterparts in 2022:

| T. Rowe Price TDF in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Lower Cost Collective Trust Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2025 | 0.39% | T. Rowe Price Retirement 2025 Tr-F | 0.37% | 5% |
| T. Rowe Price Retirement 2030 | 0.41% | T. Rowe Price Retirement 2030 Tr-F | 0.37% | 11% |
| T. Rowe Price Retirement 2035 | 0.42% | T. Rowe Price Retirement 2035 Tr-F | 0.37% | 14% |
| T. Rowe Price Retirement 2040 | 0.43% | T. Rowe Price Retirement 2040 Tr-F | 0.37% | 16% |
| T. Rowe Price Retirement 2045 | 0.44% | T. Rowe Price Retirement 2045 Tr-F | 0.37% | 19% |
| T. Rowe Price Retirement 2050 | 0.45% | T. Rowe Price Retirement 2050 Tr-F | 0.37% | 22% |
| T. Rowe Price Retirement 2055 | 0.46% | T. Rowe Price Retirement 2055 Tr-F | 0.37% | 24% |
| T. Rowe Price Retirement 2060 | 0.46% | T. Rowe Price Retirement 2060 Tr-F | 0.37% | 24% |
| T. Rowe Price Retirement 2065 | 0.46% | T. Rowe Price Retirement 2065 Tr-F | 0.37% | 24% |
| | | | | |
| **Average** | **0.44%** | | **0.37%** | **18%** |

118.   The following chart provides an example of how much more expensive the Plan's

T. Rowe Price TDFs were than their substantially identical collective trust counterparts in 2021:

| T. Rowe Price TDF in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Lower Cost Collective Trust Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2025 | 0.39% | T. Rowe Price Retirement 2025 Tr-F | 0.37% | 5% |
| T. Rowe Price Retirement 2030 | 0.41% | T. Rowe Price Retirement 2030 Tr-F | 0.37% | 11% |
| T. Rowe Price Retirement 2035 | 0.42% | T. Rowe Price Retirement 2035 Tr-F | 0.37% | 14% |
| T. Rowe Price Retirement 2040 | 0.43% | T. Rowe Price Retirement 2040 Tr-F | 0.37% | 16% |
| T. Rowe Price Retirement 2045 | 0.44% | T. Rowe Price Retirement 2045 Tr-F | 0.37% | 19% |
| T. Rowe Price Retirement 2050 | 0.45% | T. Rowe Price Retirement 2050 Tr-F | 0.37% | 22% |
| T. Rowe Price Retirement 2055 | 0.46% | T. Rowe Price Retirement 2055 Tr-F | 0.37% | 24% |
| T. Rowe Price Retirement 2060 | 0.46% | T. Rowe Price Retirement 2060 Tr-F | 0.37% | 24% |
| T. Rowe Price Retirement 2065 | 0.46% | T. Rowe Price Retirement 2065 Tr-F | 0.37% | 24% |
| | | | | |
| **Average** | **0.44%** | | **0.37%** | **18%** |

119.    The following chart provides an example of how much more expensive the Plan's

T. Rowe Price TDFs were than their substantially identical collective trust counterparts in 2020:

| T. Rowe Price TDF in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Lower Cost Collective Trust Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2025 | 0.46% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 7% |
| T. Rowe Price Retirement 2030 | 0.49% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 14% |
| T. Rowe Price Retirement 2035 | 0.50% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 16% |
| T. Rowe Price Retirement 2040 | 0.51% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 19% |
| T. Rowe Price Retirement 2045 | 0.51% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 19% |
| T. Rowe Price Retirement 2050 | 0.52% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 21% |
| T. Rowe Price Retirement 2055 | 0.52% | T. Rowe Price Retirement 2055 Tr-F | 0.43% | 21% |
| T. Rowe Price Retirement 2060 | 0.52% | T. Rowe Price Retirement 2060 Tr-F | 0.43% | 21% |
| | | | | |
| **Average** | **0.50%** | | **0.43%** | **17%** |

120.    The expense ratios in the other years of the Class Period were similar to the examples for the years shown above.

121.    A prudent fiduciary conducting a prudent, impartial review of the Plan's investments would have identified the collective trust option and transferred the Plan's investments into the above-referenced collective trusts at the earliest opportunity.

122.    Defendants failed to take such action, thereby acting imprudently.

123.    The T. Rowe Price TDFs used by the Plan were as much as 24% more expensive than the substantially identical collective trust fund versions that the Plan could have utilized.

124.    Because the marketplace for retirement plans is competitive and the Plan's pool of assets is large, it is plausible, and indeed reasonable, to infer that Defendants were asleep at the wheel or did not negotiate aggressively enough and are guilty of a failure of effort or competence and failure to act with the immediacy that ERISA requires.

125.    At all times during the Class Period, had Defendants utilized a prudent process and been properly discharging their duties for the exclusive benefit of the participants and allowing the participants to be charged only reasonable fees, Defendants would have known or should have known of the existence of the same T. Rowe Price target-date investment in the lower-cost collective trust offering and would therefore have promptly transferred the Plan's funds into these lower cost versions of the same investment options.

126.    Failing to utilize the lower cost collective trust options in the Plan shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

127.    As a result of Defendants' breach of their fiduciary duties, the Plan and its participants unnecessarily incurred excessive investment fees, costing them thousands of dollars.

**The fiduciaries of the Plan selected and retained investment
options that were more expensive than substantially similar and
<u>better-performing alternative investment options available to the Plan</u>**

128.   The Plan offered between 14 and 16 single asset class investment options during the Class Period.

129.   At least eight of these single asset class investment options were more expensive, and in most cases considerably more expensive, than substantially similar and better performing alternative investment options available to the Plan.

130.   These expensive funds, and examples of substantially similar lower-cost alternative investment options, are shown in the following chart, along with their applicable expense ratios, as of December 31, 2023:

| Fund in Plan | In-Plan Expense Ratio | Lower cost better performing similar fund | Lower cost alternative fund fee | Percent Fee Excess |
|---|---|---|---|---|
| Schwab Select Large Cap Growth | 0.72% | BlackRock Russell 1000 Growth Idx CL 6 | 0.07% | 929% |
| | | Pioneer Large Cap Growth Port CL R1 | 0.38% | 89% |
| | | | | |
| Western Asset Core Plus Bond I | 0.45% | Bridge Builder Core Plus Bond | 0.15% | 200% |
| | | Strategic Advisers Fidelity Core | 0.23% | 96% |
| | | Neuberger Berman Core Bond R6 | 0.29% | 55% |
| | | TIAA-CREF Core Plus Bond Instl | 0.29% | 55% |
| | | Baird Core Plus Bond Inst | 0.30% | 50% |
| | | | | |
| Hartford Schroders Emerging Mkts Eq SDR | 1.07% | Vanguard Emerging Mkts Stock Idx Instl | 0.10% | 970% |
| | | DFA Emerging Markets I | 0.35% | 206% |
| | | | | |

| Fund in Plan | In-Plan Expense Ratio | Lower cost better performing similar fund | Lower cost alternative fund fee | Percent Fee Excess |
|---|---|---|---|---|
| William Blair International Sm Cap Gr R6 | 1.14% | Neuberger Berman Int'l Small Cap R6 | 0.98% | 16% |
|  |  | Federated Int'l Small Mid Instl Class | 0.99% | 15% |
|  |  |  |  |  |
| Western Asset Inflation Idxd Plus Bd IS | 0.28% | Fidelity Inflation-Protection Bond Index | 0.05% | 460% |
|  |  | Schwab Treasury Inflation Protected Securities Index | 0.05% | 460% |
|  |  | Vanguard Inflation-Protected Secs I | 0.07% | 300% |
|  |  | DFA Inflation-Protected Securities I | 0.11% | 155% |
|  |  |  |  |  |
| Touchstone Value Inst | 0.68% | Vanguard S & P Value Index Instl | 0.08% | 750% |
|  |  | Fidelity SAI US Value Index | 0.11% | 518% |
|  |  |  |  |  |
| **Average** | **0.72%** |  | **0.27%** | **167%** |

131. The lower-cost alternatives listed above performed comparably with or better than, and in some cases significantly better than, their comparable higher-cost option in the Plan.

132. The expense ratios for the in-plan and substantially similar alternative investment options in the other years of the Class Period were similar to the expense ratios shown above, which are provided simply as a specific illustration.

133. The substantially similar, but lower-cost, alternative investment options in the chart above were identified using an industry recognized software program that uses quantitative methods, such as returns-based and holdings-based correlation analysis, to find funds that are highly similar to the fund being analyzed, resulting in an apples-to-apples comparison.

134. In addition to the similar, but lower-cost, alternative investment options identified

above, Defendants also failed to lower the Plan's fees by replacing index funds from one company (Vanguard) with less expensive funds from other companies (e.g., Fidelity or State Street).

135. Index funds are a type of fund that tracks the returns of a particular market index.

136. Market indexes measure the performance of a "basket" of securities, like stocks or bonds. This "basket" of securities is supposed to represent a sector of an economy or stock market. A person may invest in an index indirectly, through an index fund that tracks a market index.

137. Generally, index funds are a passive—meaning no fund manager is required—way to invest, aiming to maximize returns over a long time period by not buying and selling securities as often.

138. Various investment companies may provide investment products that track the same index. For example, well-known investment companies such as Vanguard, Fidelity, and State Street all offer investment products that track the S&P 500 Index. However, the price of these products, which track the exact same index, can vary by as much as 300%.

139. Examples of substantially similar but lower-cost alternative index options are shown in the following chart, along with their applicable expense ratios (using, as an example, expense ratios as of December 31, 2021):

| Index Fund in Plan | In-Plan Expense Ratio | Lower cost alternative index fund | Lower cost alternative fund fee | Percent Fee Excess |
|---|---|---|---|---|
| Vanguard Institutional Index I | 0.04% | State St S&P 500 Indx SL Cl II | 0.01% | 300% |
| Vanguard Institutional Index I | 0.04% | Fidelity S & P 500 | 0.02% | 100% |
| Vanguard Total Bond Market Index I | 0.04% | State St US Bnd Indx SL Cl XIV | 0.02% | 100% |
| | | | | |
| **Average** | **0.04%** | | **0.02%** | **140%** |

140. A prudent and loyal fiduciary would not have selected investment options that were

significantly more expensive but performed no better (or worse) than substantially similar alternative investment options.

141. No reasonable, prudent justification exists for Defendants' failure to offer these lower-cost alternatives.

**The fiduciaries of the Plan selected and retained investment options with revenue sharing, thereby not acting for the sole interest of the participants and causing participants additional economic losses**

142. The Plan's Form 5500 for 2022 indicates that its recordkeeper, Fidelity, received a small amount of indirect compensation, presumably in the form of what the industry refers to as "revenue sharing," from two of its funds, including the aforementioned overly priced Schwab Select Large Cap Growth Fund.

143. A plan's recordkeeping expenses can either be paid directly from plan assets, indirectly by the plan's investments in this practice known as "revenue sharing," or a combination of both.

144. "Revenue sharing" payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

145. The limited information provided in the Form 5500 is not specific enough to determine the value of this revenue sharing from the Schwab Select Large Cap Growth Fund. Upon information and belief, the amount received was not sufficient to offset the excessive costs of that fund, as set forth in the relevant chart above.

146. Regardless, even if a fiduciary believes that the excessive fees a fund is charging to plan participants are somehow offset by the revenue sharing paid by the fund to defray the plan's recordkeeping costs, it is not prudent to select the higher cost fund, and it does not justify

Defendants' inclusion of the excessively priced Schwab Select Large Cap Growth Fund.

147. Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Tibble v. Edison Int'l*, No. 07-5359 SVW (AGRx), 2017 WL 3523737, at *11 (C.D. Cal. Aug. 16, 2017).

148. The "indirect compensation" to recordkeepers in the form of "revenue sharing" is really just "a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, *Revenue Sharing and Invisible Fees*, Revenue Sharing and Invisible Fees (cccandc.com) (last visited February 12, 2024).

149. Furthermore, to the extent Defendants selected investment funds that paid revenue sharing, had the revenue-sharing proceeds credited to a revenue-sharing account (i.e., an account held by the Plan to collect revenue-sharing proceeds until the Defendants utilized the revenue-sharing proceeds to pay expenses), and held those revenue-sharing funds for a prolonged period of time, Defendants deprived participants of the use of those funds and the compounding effect thereon, thereby failing to act in the sole interest of the participants, failing to act for the exclusive purposes of providing benefits and defraying reasonable expenses (in fact, causing the Plan to incur additional administrative burdens), and breaching their fiduciary duties.

150. In addition, to the extent Defendants failed to timely remit any excess revenue sharing back to Plan participants, this was a further breach of Defendants' fiduciary duties, as noted immediately above.

## CLASS ACTION ALLEGATIONS

151. In addition to bringing this action on behalf of the Plan, pursuant to ERISA, Plaintiff also brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class identified as follows: All participants in and beneficiaries of the Plan from the date six years before the filing of the original Complaint to present, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families (the "Class").

152. Certification of the Class is appropriate under Rule 23(a) and Rule 23(b)(1), (b)(2), and/or (b)(3).

153. The Plan had thousands of participants, all of whom suffered from the imprudent investment options and excessive and improper fees alleged herein.

154. The number of Class members is so large that joinder of all its members is impracticable.

155. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual class members.

156. Common legal and factual questions include, but are not limited to:

(a) Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plan and services for the Plan;

(b) Whether the investment decisions made by Defendants were prudent;

(c) Whether the investment decisions made by Defendants were solely in the interests of the Plan's participants and beneficiaries;

(d) Whether the defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

(e) Whether the Plan suffered losses as a result of Defendants' fiduciary

breaches; and

(f)    Whether Defendants' acts proximately caused losses to the Plan and, if so, the appropriate relief to which Plaintiff, on behalf of the Plan and the Class, is entitled.

157.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all class members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

158.    Plaintiff will fairly and adequately represent the Class and has retained counsel competent in the prosecution of ERISA class-action litigation.

159.    Plaintiff has no interests antagonistic to those of other members of the Class.

160.    Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

161.    Plaintiff has standing to bring this action on behalf of the Plan because he is a current participant in the Plan and he was injured by Defendants' unlawful conduct.

162.    Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently or as of the time the account was distributed, and what his account is or would have been worth but for Defendants' breaches of their fiduciary duties as described herein.

163.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system with respect to the resolution of the issues raised in this action. By contrast, the class action device provides the benefits of

adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court. This case presents no unusual management difficulties.

164.   Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

165.   Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

166.   In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

167.   In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

### CLAIMS FOR RELIEF

### First Claim for Relief:  Breach of ERISA Fiduciary Duties

168.   Plaintiff realleges and incorporates by reference all other allegations in this Amended Complaint as if fully set forth herein.

169.   Defendants were fiduciaries of the Plan within the meaning of 29 U.S.C. §

1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

170. As the fiduciaries of the Plan, Defendants breached their fiduciary duties to the Plan and its participants and beneficiaries in multiple respects and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

171. As detailed above, Defendants had fiduciary responsibilities with respect to selecting, monitoring, retaining, and removing investment options in the Plan and minimizing fees.

172. As detailed above, Defendants caused the Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities and failed to leverage the size of the Plan to minimize costs.

173. By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

174. By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

175. Defendants knowingly participated in the breaches of each of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such defendant's own duties, and knew of the violations by the other Defendants but failed to make any reasonable and timely effort under the circumstances to remedy

34

the breaches.

176. Accordingly, each of Defendants is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a). As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid substantial excess investment management and other related fees during the Class Period, and suffered lost opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2).

177. The Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

178. If Defendants had complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have more money available to them for their retirement.

179. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches, and Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in Plaintiff's Prayer for Relief.

**Second Claim for Relief: Failure to Adequately Monitor Other Fiduciaries**

180. Plaintiff realleges and incorporates by reference all other allegations in this Amended Complaint as if fully set forth herein.

181. Upon information and belief, Hess appointed and thus had a duty to monitor the Investment Committee to ensure that it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event the Investment Committee was not fulfilling those duties.

182. Hess had the authority and obligation to monitor the Investment Committee and

was aware the Investment Committee had critical responsibilities as a fiduciary of the Plan.

183. Hess had a duty to ensure the members of the Investment Committee possessed the needed qualifications and experience to carry out the Investment Committee's duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to it or them.

184. Hess breached its fiduciary monitoring duties by, *inter alia*, the following: (a) failing to monitor and evaluate the performance of the Investment Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Investment Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the Plan's investments were evaluated; and (c) failing to remove members or responsibilities from the Investment Committee as a fiduciary, given that the Investment Committee's performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and the retirement savings of the Plan's participants.

185. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.

186. Had Hess complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

187. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Hess is liable to restore to the Plan all losses caused by its failure to adequately monitor the Investment Committee, and Plaintiff is entitled to equitable relief and other appropriate relief as set forth in Plaintiff's Prayer for Relief.

**PRAYER FOR RELIEF**

Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

(a)    A determination that Plaintiff may proceed on behalf of the Plan, in accordance with ERISA;

(b)    A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

(c)    Designation of Plaintiff as Class Representative, and designation of Plaintiff's counsel as Class Counsel;

(d)    An order certifying the proposed Class;

(e)    A declaration that Defendants, and each of them, have breached their fiduciary duties under ERISA;

(f)    An order compelling Defendants to make good to the Plan all losses resulting from Defendants' breaches of their fiduciary duties as outlined herein, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits that the participants would have made if Defendants had fulfilled their fiduciary obligations;

(g)    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(h)    An order enjoining Defendants from committing any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(i)    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of the Plan's fiduciaries deemed to have breached their fiduciary duties;

(j)    An award of pre-judgment and post-judgment interest;

(k)    An award of costs pursuant to 29 U.S.C. § 1132(g);

(l)    A service award to the Class Representatives;

(m)    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

(n)    All such other and further relief as the Court deems equitable and just.

37

Respectfully submitted,

By:  /s/ *Andrew C. Whitaker*
　　　Andrew C. Whitaker
　　　State Bar No. 21273600
　　　andrew.whitaker@figdav.com
　　　Parker D. Young
　　　State Bar No. 22204050
　　　parker.young@figdav.com

FIGARI + DAVENPORT, LLP
901 Main Street, Suite 3400
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (telecopy)

/s/ Scott Nehrbass
Scott Nehrbass *(pro hac vice granted)*
State Bar No. 24122714
snehrbass@foulston.com
FOULSTON SIEFKIN LLP
7500 College Boulevard, Suite 1400
Overland Park, Kansas 66210-4041
(913) 253-2144
(913) 498-2101 (telecopy)

**ATTORNEYS FOR PLAINTIFF**